## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION
## No. 5:14-CV-863-D

| | |
|---|---|
| CLEAN AIR CAROLINA, NORTH ) | |
| CAROLINA WILDLIFE FEDERATION, ) | |
| and YADKIN RIVERKEEPER, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| NORTH CAROLINA DEPARTMENT OF ) | |
| TRANSPORTATION, et al., ) | |
| ) | |
| Defendants. ) | |

On June 23, 2014, Clean Air Carolina, the North Carolina Wildlife Federation, and Yadkin

Riverkeeper ("plaintiffs") filed a complaint in the United States District Court for the Western

District of North Carolina against the North Carolina Department of Transportation ("NCDOT") and

Anthony Tata, in his official capacity as Secretary of NCDOT ("state defendants"), and the Federal

Highway Administration ("FHWA") and John F. Sullivan, in his official capacity as Division

Administrator of FHWA ("federal defendants"). Compl. [D.E. 1] ¶¶ 34–37.¹ Plaintiffs allege that

defendants violated the National Environmental Policy Act ("NEPA"), codified at 42 U.S.C. §§

4321 et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06, in connection

with their decision to construct the Monroe Bypass Toll Highway ("Monroe Bypass") in Union and

Mecklenburg Counties, North Carolina. Compl. ¶ 1.

---

¹ The court jointly refers to the state defendants and federal defendants as "defendants." The
court automatically substitutes Secretary Nick Tennyson for former Secretary Anthony Tata. See
Fed. R. Civ. P. 25(d).

On December 3, 2014, the United States District Court for the Western District of North Carolina transferred the case to this court [D.E. 29]. On January 23, 2015, plaintiffs moved for summary judgment [D.E. 40] and filed an accompanying memorandum [D.E. 40-1]. On February 26, 2015, federal defendants and state defendants each moved for summary judgment and filed accompanying memoranda in support of their motions and in opposition to plaintiffs' motion for summary judgment [D.E. 41, 41-1, 43–44]. On March 31, 2015, plaintiffs replied [D.E. 45]. On May 1, 2015, federal defendants and state defendants each replied [D.E. 52–53]. On May 12, 2015, plaintiffs filed a surreply [D.E. 55].

On May 14, 2015, plaintiffs moved for a temporary restraining order and preliminary injunction [D.E. 56]. On June 5, 2015, federal defendants and state defendants each responded in opposition [D.E. 61–62]. On June 11, 2015, plaintiffs replied [D.E. 63]. On June 16, 2015, defendants filed a surreply [D.E. 66]. On August 25, 2015, plaintiff moved for a hearing [D.E. 73].

As explained below, the court grants defendants' motions for summary judgment, denies plaintiffs' motion for summary judgment, and denies plaintiffs' motion for a temporary restraining order and preliminary injunction and motion for a hearing.

I.

This case concerns the planned construction of the Monroe Bypass, a 20-mile, four- to six-lane toll highway project in western North Carolina. Compl. ¶ 1; ARII376498.[2] The Monroe Bypass project originally began as two separate projects, the Monroe Bypass and the Monroe Connector.

_____

[2] This project has been the subject of much litigation. See N.C. Wildlife Fed'n v. N.C. Dep't of Transp., No. 5:10-CV-476-D, 2011 WL 5042075 (E.D.N.C. May 3, 2012) (unpublished), vacated and remanded, 677 F.3d 596 (4th Cir. 2012). The court assumes the reader's familiarity with the case's history. See N.C. Wildlife Fed'n v. N.C. Dep't of Transp., 677 F.3d 596, 598–600 (4th Cir. 2012); N.C. Wildlife Fed'n, 2011 WL 5042075, at *2–6.

ARII376487. NCDOT completed its initial planning phase for these projects in 1996. Id. In 2002, the North Carolina General Assembly created the North Carolina Turnpike Authority ("NCTA"). Id. In February 2005, at the request of the Mecklenburg-Union Metropolitan Planning Organization ("MUMPO"), NCTA adopted the Monroe Connector as a candidate toll facility. ARII376488. On September 20, 2006, MUMPO adopted a resolution recommending that the Monroe Bypass and Monroe Connector projects be combined. Id. On January 19, 2007, FHWA issued a notice of intent to prepare a Draft Environmental Impact Statement ("EIS") for the combined project. Id.

The Draft EIS was signed on March 31, 2009. Id. The Final EIS was published in May 2010. ARII376489; AR26203–26421. The Record of Decision ("ROD") was published in August 2010. ARII376489; AR29614–29714. On November 2, 2010, plaintiffs filed suit in this court seeking to vacate the ROD. N.C. Wildlife Fed'n v. N.C. Dep't of Transp., No. 5:10-CV-476-D, 2011 WL 5042075, at *1 (E.D.N.C. May 3, 2012) (unpublished), vacated and remanded, 677 F.3d 596 (4th Cir. 2012). On October 24, 2011, this court concluded that defendants had complied with NEPA and granted defendants' motion for summary judgment. Id. On May 3, 2012, the Fourth Circuit vacated this court's judgment and remanded for further proceedings. N.C. Wildlife Fed'n, 677 F.3d at 605. In so doing, the Fourth Circuit held that defendants violated NEPA by failing to disclose that data upon which they relied assumed construction of the Monroe Bypass and by "falsely respond[ing] to public concerns." Id. at 605.

On July 3, 2012, FHWA rescinded the ROD for the Monroe Bypass project. See ARII376490; ARII96984. NCDOT reinitiated the NEPA process. See ARII97440–43 (minutes from July 18, 2012 meeting discussing the Fourth Circuit's decision in North Carolina Wildlife Federation and next steps); ARII116553 (May 3, 2012 NCDOT news release expressing the department's intention to promptly develop a new plan for the project).

3

On November 8, 2013, defendants published the Draft Supplement Final EIS ("DSFEIS"). ARII258107–308. Defendants "re-evaluated the primary needs for the proposed action and determined that those needs have not changed since the Draft EIS and Final EIS." ARII258138. The DSFEIS noted that traffic congestion had improved along the US 74 corridor but asserted that congestion problems remained. See ARII258140 ("[A]verage peak period travel speed through the corridor ranges from 37 mph to 41 mph in the westbound direction, and 42 mph to 45 mph in the eastbound direction. These average speeds compared to the corridor weighted average posted speed limit of 49 mph show that congestion exists along US 74 today . . . ."). In its alternatives analysis, the DSFEIS referenced and relied on the screening decisions made in the original DEIS and FEIS. ARII258156–64. After noting that some improvements had been realized because of Transportation System Management ("TSM") improvements, the DSFEIS stated that "TSM improvements, while providing some short-term benefit, would continue to not meet the purpose and need for the Monroe Connector/Bypass project." ARII258166; see ARII258180 ("The NCDOT examined 'minor' improvements and evaluated and re-examined others (i.e. improve existing US 74 alternatives and TSM alternatives) with a 'hard look' and subsequently determined that they were not reasonable and did not require more detailed study."). Defendants determined, "based on a review of new information and analyses and consideration of public and agency comments," that "there are no conditions that warrant re-considering new alternatives or updating previous screening decisions." ARII258181; see ARII258157 (describing the three "evaluation criteria" that were "applied to the analysis of each alternative concept" as the alternative's ability to (1) "enhance mobility and increase capacity in the US 74 corridor[,]" (2) "allow for high-speed regional travel[,]" and (3) "maintain access to properties along existing US 74"); ARII106492 (defining high-speed travel as "50 mph or greater average travel speed"). Defendants concluded that the Monroe Bypass "remain[ed] the best

4

option due to its ability to meet all elements of the purpose and need and based on results of comparative analysis." ARII258181.

Defendants also reevaluated their use of the Metrolina Regional Travel Demand Model ("MRM") and MUMPO's underlying socioeconomic data in an updated Indirect and Cumulative Effects ("ICE") quantitative analysis. See ARII258547–50. The original MUMPO projections relied on three parts: a top-down approach, a bottom-up approach, and input from an advisory group. ARII258549. The top-down approach, conducted by Dr. Thomas Hammer, "project[ed] future growth at the regional level and then allocate[d] the regional growth to the county level." ARII258549–50. Dr. Hammer's process assumed the construction of two roadway projects, including the Garden Parkway, but did not assume construction of the Monroe Bypass. ARII258552; ARII258607–09. In the bottom-up approach, Paul Smith used eight land development factors, including travel time to employment, to allocate "the county-level growth to the TAZ [Traffic Analysis Zone] level within each county." ARII258550; see ARII258610. The original travel-time-to-employment factor used a roadway network that included the Monroe Bypass. ARII258551; ARII258611. In North Carolina Wildlife Federation, the Fourth Circuit noted that one of the inputs into the MRM, travel time to employment, "actually assumed construction of the Monroe Connector." 677 F.3d at 599–600 (emphasis omitted). Noting that "courts not infrequently find NEPA violations when an agency miscalculates the 'no build' baseline or when the baseline assumes the existence of a proposed project," the court held that defendants' failure to disclose this assumption violated NEPA. Id. at 603, 605.

In their latest analysis, defendants retained Paul Smith to conduct the bottom-up analysis. See ARII258551. In this new analysis, Smith used a roadway network that did not include the Monroe Bypass to generate new travel-time-to-employment data. ARII258613. Smith concluded

5

that the removal of the Monroe Bypass created "little to no change in travel time to employment centers" in over ninety percent of the TAZs in the MUMPO analysis area. Id. Smith then input the revised travel-time-to-employment data into the bottom-up analysis and found that "the land use projections were identical to those produced in his original report." ARI258614. Defendants thus concluded that "the Bottom-Up portion of the 2005 Projections was insensitive to the presence or absence of the proposed project." ARII258614.

Because the top-down analysis did not assume construction of the Monroe Bypass and the new bottom-up analysis was insensitive to the Monroe Bypass's presence, defendants used MUMPO's predictions to create the No Build scenario. See ARII258626. To create a more accurate Build scenario that accounted for increased growth due to the project, defendants also estimated the project-induced growth. See ARII258626; ARII258629; ARII258553 ("We estimated the potential induced growth and induced land use changes associated with the proposed project and added that estimated induced growth to the No-Build land use scenario to create a new scenario that represents future conditions with the project and its growth-inducing impacts (i.e. the Build Scenario)."). To estimate this induced growth, defendants relied on a combination of the following analytical techniques: (1) "a scenario writing approach to identify areas most likely to see induced growth based on planning information and interviews[;]" (2) "a build-out analysis to see which areas had the most capacity for induced growth[;]" (3) "an accessibility analysis to see which areas would most benefit from the proposed project and thus be most likely to see induced growth[;]" and (4) "a Hartgen Analysis to estimate potential commercial growth at interchange areas." ARII258553; see ARII258631–36. Defendants added the growth to the No Build scenario to create the Build scenario. See ARII258553; ARII258633.

6

In December 2013, defendants hosted three public hearings on the DSFEIS. ARII376490. Plaintiffs submitted comments on the DSFEIS. See ARII376787 (commenting as Southern Environmental Law Center); ARII376970–377017. Plaintiffs also submitted an expert report from Dr. David Hartgen. See ARII296501. Dr. Hartgen criticized defendants for relying on outdated traffic forecasts and "simply ignor[ing] the last 12 years of history regarding traffic trends on U.S. 74." ARII296518.

On May 15, 2014, defendants released a combined Final Supplemental Final EIS ("FSFEIS") and ROD. See ARII377629 (FSFEIS); ARII376478 (ROD); cf. ARII258122 (noting, in the DSFEIS, defendants' intention to produce a combined FSFEIS and ROD); ARII377189–92. The FSFEIS discussed new socioeconomic projections that had been released in January 2014. ARII377403. Dr. Stephen Appold conducted a top-down analysis of the 2014 projections, which yielded "[t]wo major differences" from Dr. Hammer's analysis. ARII377405. First, Dr. Appold forecast "lower levels of employment and household growth across the region" because of "the recent economic disruptions." Id. Second, Dr. Appold forecast "more growth closer to the existing urban core and less to the peripheral communities." Id. Overall, for 2030, Dr. Appold forecast 10% more households and 1% more employment in Mecklenburg County than Dr. Hammer's original 2003 projections, and 9% fewer households and 23% less employment in Union County than Dr. Hammer's original 2003 projections. ARII377406. In comparison to the 2009 projections, for 2030, Dr. Appold forecast 1% more households and 4% less employment in Mecklenburg County, and 16% fewer households and 21% less employment in Union County. ARII377407. The FSFEIS noted that, "while the forecasts of household and employment are substantially lower in Year 2030 in the 2014 Projections, substantial growth is still expected to occur between 2010 and 2030." Id. (estimating roughly 2% annual growth in Union County). The FSFEIS predicted that Union County

7

would now reach the previous 2030 growth estimates by 2040. Id. The FSFEIS also discussed Dr. Hartgen's report and determined that "the traffic forecasts prepared for the project are relevant and are to be used as part of the NEPA decision-making process." ARII377424.

On June 9, 2014, plaintiffs submitted additional comments and asked defendants to issue a supplemental EIS to address their concerns. ARII389305–324. On June 23, 2014, plaintiffs filed the instant action. [D.E. 1]. On November 5, 2014, defendants denied plaintiffs' request for a supplemental EIS. ARII413533.

II.

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The party seeking summary judgment must initially show an absence of genuine dispute of material facts or the absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If a moving party meets its burden, the nonmoving party must "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quotation and emphasis omitted). A genuine issue for trial exists if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." Id. at 252; see Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Only factual disputes that might affect the outcome under substantive law properly preclude summary judgment. Anderson, 477 U.S. at 248. In reviewing the factual record, the court views the facts in the light most favorable to the nonmoving party and draws reasonable

8

inferences in that party's favor. Matsushita, 475 U.S. at 587.

The Rule 56(a) standard applies differently for an APA claim. "A court conducting judicial review under the APA does not resolve factual questions, but instead determines whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." Ohio Valley Envtl. Coal. v. Hurst, 604 F. Supp. 2d 860, 879 (S.D. W. Va. 2009) (quotation omitted); see Defenders of Wildlife v. N.C. Dep't of Transp., 762 F.3d 374, 392–93 (4th Cir. 2014); Occidental Eng'g Co. v. INS, 753 F.2d 766, 769–70 (9th Cir. 1985). Thus, in an APA claim, "summary judgment becomes the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." Hurst, 604 F. Supp. 2d at 879 (quotation omitted); see Defenders of Wildlife, 762 F.3d at 392–93; Occidental Eng'g Co., 753 F.2d at 769–70; Kight v. United States, 850 F. Supp. 2d 165, 169 (D.D.C. 2012).[3] Moreover, under the APA, the plaintiff has the burden of proof and must demonstrate that defendants' actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Sierra Club v. Marita, 46 F.3d 606, 619 (7th Cir. 1995).

"NEPA claims are subject to judicial review under the" APA. N.C. Wildlife Fed'n, 677 F.3d at 601. The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); see Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 763 (2004); N.C. Wildlife Fed'n, 677 F.3d at 601. The court's inquiry into "whether there has been a clear error of judgment . . . . must be searching and careful, but the ultimate standard of review is

---

[3] The court notes the particular relevance of Rule 56(c)(3) in this case, which involves more than 400,000 pages in the administrative record. See Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

a narrow one." Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989) (quotations omitted); N.C. Wildlife Fed'n, 677 F.3d at 601; Hughes River Watershed Conservancy v. Johnson, 165 F.3d 283, 287 (4th Cir. 1999). This standard is "highly deferential" but "does not reduce judicial review to a rubber stamp of agency action." Friends of Back Bay v. U.S. Army Corps of Eng'rs, 681 F.3d 581, 587 (4th Cir. 2012) (quotations omitted). "A reviewing court must ensure that the agency has examined the relevant data and articulated a satisfactory explanation for its actions . . . ." N.C. Wildlife Fed'n, 677 F.3d at 601 (quotation and alterations omitted). "[I]f the agency has followed the proper procedures, and if there is a rational basis for its decision, [the court] will not disturb its judgment." Webster v. U.S. Dep't of Agric., 685 F.3d 411, 422 (4th Cir. 2012) (quotation omitted).

NEPA requires agencies to follow "a set of action-forcing procedures that require that agencies take a hard look at environmental consequences and that provide for broad dissemination of relevant environmental information." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989) (quotations and citation omitted); see also Defenders of Wildlife, 762 F.3d at 393; Friends of Back Bay, 681 F.3d at 587; N.C. Wildlife Fed'n, 677 F.3d at 601. "NEPA itself does not mandate particular results, but simply prescribes the necessary process." Robertson, 490 U.S. at 350. Thus, "NEPA merely prohibits uninformed—rather than unwise—agency action." Id. at 351.

III.

Plaintiffs allege that defendants violated NEPA and the APA in four fundamental ways: (1) defendants' alternatives analysis was arbitrary and capricious; (2) defendants' analysis of environmental impacts was arbitrary and capricious; (3) defendants fostered a climate of misinformation and thereby undermined the NEPA process; and (4) defendants' issuance of a combined FSFEIS and ROD violated 42 U.S.C. § 4332a(b). See Pls.' Mem. [D.E. 40-1] 2–3.

10

A.

First, plaintiffs argue that defendants improperly analyzed alternative solutions. NEPA requires agencies contemplating "major Federal actions significantly affecting the quality of the human environment" to prepare an environmental impact statement. 42 U.S.C. § 4332(C); see 40 C.F.R. §§ 1502.3, 1502.4.[4] The EIS must "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14. This alternatives analysis "is the heart of the environmental impact statement." Id. The analysis must include direct and indirect effects of the alternatives. See 40 C.F.R. § 1502.16. For agencies to define the range of alternatives, they must first "briefly specify the underlying purpose and need." 40 C.F.R. § 1502.13. The agencies then must "[r]igorously explore and objectively evaluate all reasonable alternatives" to meet that purpose and need. 40 C.F.R. § 1502.14(a). Furthermore, agencies must "[i]nclude the alternative of no action" in the EIS whether or not it has been eliminated as a reasonable alternative. 40 C.F.R. § 1502.14(d); N.C. Wildlife Fed'n, 677 F.3d at 602.

Plaintiffs argue that defendants' alternatives analysis failed in two respects: (1) the analysis did not "account for a decade of transportation and growth trends," and (2) the analysis impermissibly relied on a single set of socioeconomic data. See Pls.' Mem. [D.E. 40-1] 27–37.

1.

Plaintiffs argue that defendants violated NEPA and the APA by failing to adequately consider alternatives in the DSFEIS and FSFEIS. Specifically, plaintiffs allege that defendants failed to revisit previously-eliminated alternatives when the basis for their elimination turned out to be

---

[4] The Monroe Bypass project constitutes a "major federal action" that requires an EIS. See N.C. Wildlife Fed'n, 677 F.3d at 602.

11

unsupported by current conditions. See Pls.' Mem. [D.E. 40-1] 27–31; Pls.' Reply [D.E. 45] 17-26; Pls.' Surreply [D.E. 55] 5–6.

In the 2009 DEIS, defendants explained that the average peak speeds through the US 74 corridor were 24 to 29 miles per hour, with travel times of 47 to 50 minutes, and projected that by 2030 the average speed would be 17 to 21 miles per hour, with travel times of 68 to 70 minutes. AR14052. Defendants eliminated some alternatives to the Monroe Bypass based on these projections, including eliminating TSM improvements to US 74 because "the amount of traffic projected for 2030 along US 74 would overwhelm the effectiveness of minor TSM improvements" and "the TSM Alternative concept would not be consistent with the NC [Strategic Highway Corridor] program." ARII40564–66; see AR14070–72 ("A need has been identified to provide increased roadway capacity to accommodate existing and projected traffic volumes in this corridor. These TSM measures would provide only minor improvements and not create any additional capacity along US 74."). Defendants also eliminated a mass transit/multi-modal alternative because it was "determined not to meet the purpose and need of the project .... [This alternative] would not noticeably improve mobility and capacity because it would not divert enough vehicular traffic [off of US 74]." AR14073. Although a mass transit/multi-modal alternative "could provide high-speed service for some users," "it would serve much lower volumes than a roadway and would serve only individual passengers, not freight." ARII40566–67; see also ARII40566–67 (noting the lack of funding for mass transit/multi-modal alternatives).

After the 2009 DEIS, travel volumes have remained stable and travel speeds have increased by up to 20 miles per hour to an average peak speed of approximately 44 miles per hour. ARII256139; ARII389171–72. This improvement has been driven, at least in part, by TSM improvements along US 74. See ARII258164–66. Additional TSM improvements are scheduled.

12

ARII258166 (noting that four conversions of intersections to "superstreet facilities" are "scheduled for construction in late 2015"). Defendants acknowledged the improvements but concluded that "[e]xisting average speeds along US 74 are less than posted speed limits and less than 50 mph during peak travel periods. TSM improvements, while providing some short-term benefit, would continue to not meet the purpose and need for the Monroe Connector/Bypass project." ARII258166; see ARII258179 (stating that, "[r]ather than updating the traffic operations analysis for the No-Build scenario" in light of the "physical improvements," defendants analyzed the traffic speed because "an element of the project's purpose and need is to provide a high-speed facility (50 mph or greater)"). Because the average speeds were still below 50 miles per hour and defendants projected "average volumes along the US 74 corridor . . . to increase approximately 34 percent" by 2035, defendants reasoned that future conditions "support[ed] the need for the project." ARII258150.

Essentially, plaintiffs argue that defendants should have reevaluated the possible alternatives to the Monroe Bypass in light of the improved traffic situation, including the possibility of additional TSM improvements. See, e.g., Pls.' Mem. [D.E. 40-1] 31 ("While the high traffic volumes and low travel speeds previously forecast may have led Defendants to conclude that certain solutions were unviable, current realities show that such solutions and others deserve a hard look and full public disclosure. Without such an analysis, Defendants' EIS cannot provide the basis for an informed evaluation or a reasoned decision." (quotation omitted)); ARII289973–84 (plaintiffs suggesting a range of alternatives to the Monroe Bypass); cf. 40 C.F.R. § 1502.14(a) (requiring that agencies "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated"). Plaintiffs argue that instead of engaging in such a reevaluation, defendants dismissed these alternatives based on the rationale of the original EIS. See Pls.' Reply [D.E. 45] 23; cf. Fed. Defs.'

13

Mem. [D.E. 41-1] 27–28 (citing, in reference to defendants' alternatives analysis, the DEIS and FEIS for 10 of the 14 alternatives). Plaintiffs also attack as irrational defendants' assumption of 34% growth in average traffic volumes by 2035. ARII296517–18; see ARII258174 ("Over the five-year period from 2007 to 2012, average volumes along the US 74 corridor showed approximately zero percent growth based on available [annual average daily traffic] data."); ARII377471 (chart of traffic volume trends from 1988 to 2013 showing a decrease and leveling-off after 2009); but see ARII377468–69 (noting that a 34% growth between 2012 and 2035 is equivalent to a 1.5% annual increase and that such growth "is already occurring along the [US 74] corridor").

Defendants respond that in the DSFEIS they took the necessary "hard look" at reasonable alternatives in light of current conditions. See, e.g., State Defs.' Mem. [D.E. 44] 25; Fed. Defs.' Mem. [D.E. 41-1] 18, 27. In the DSFEIS, defendants acknowledged the improved conditions but concluded that "present day operating speeds are still substantially less than desirable" and that projected growth would lead to increased travel times and decreased speeds. See ARII258149–50. Defendants looked at three alternatives (besides the No Build scenario) and rejected them as unable to sufficiently reduce projected congestion. See ARII258164. Defendants argue that because the TSM improvements did not satisfy the project needs, their decision not to alter the project's purpose and need, and their rejection of plaintiffs' proposed alternatives, was within their discretion. See State Defs.' Mem. [D.E. 44] 29, 31–32. Defendants also argue that they adequately responded to plaintiffs' proposed alternatives in the FSFEIS. See ARII377050–57; ARII377459–61.

Plaintiffs have not met their burden of showing that defendants failed to take a sufficient "hard look" at the reasonable alternatives. See 40 C.F.R. § 1502.14(a); N.C. Wildlife Fed'n, 677 F.3d at 601. In the initial DEIS, defendants eliminated, among other possible alternatives, TSM improvements because they would not meet the project needs. See ARII40564–66. In the DSFEIS,

14

defendants acknowledged the improvement in travel times and average speeds on the US 74 corridor as a result of TSM improvements, but defendants also noted that the current average speeds still did not meet the project need and that future growth would lead to increased traffic volumes and more congestion. See ARII258149–50; ARII258164–66. Plaintiffs accurately note that defendants rely on previous alternatives analysis. See, e.g., Fed. Defs.' Mem. [D.E. 41-1] 27–28. Defendants' reliance on prior explanations for ruling out certain alternatives, however, is not arbitrary and capricious or irrational when the basis for eliminating those alternatives remains valid. For example, plaintiffs argue that the increase of almost 20 miles per hour in average peak speed on the US 74 corridor undermines defendants' original rationale for eliminating TSM improvements. See Pls.' Mem. [D.E. 40-1] 28–29; Pls.' Reply [D.E. 45] 18. Defendants eliminated TSM improvements because they would not meet the project need of creating a high-speed corridor, with average speeds of at least 50 miles per hour. ARII258166. Although the average peak speed on US 74 has improved considerably, the TSM improvements still have not met the project need, and defendants reasonably eliminated that alternative in the DSFEIS. See, e.g., Webster, 685 F.3d at 422 ("Agencies enjoy considerable discretion in defining the purposes and needs for their proposed actions, provided that they are reasonable."); City of Alexandria v. Slater, 198 F.3d 862, 867 (D.C. Cir. 1999) ("We engage in both of these inquiries—whether an agency's objectives are reasonable, and whether a particular alternative is reasonable in light of these objectives—with considerable deference to the agency's expertise and policy-making role."); N. Buckhead Civic Ass'n v. Skinner, 903 F.2d 1533, 1541 (11th Cir. 1990) (noting the deference afforded to an agency's alternatives analysis). Plaintiffs' speculation concerning the effectiveness of planned TSM improvements does not make defendants' actions irrational. See ARII258166 (discussing the improvements and concluding that they are insufficient); Pls.' Reply [D.E. 45] 17–18; see Piedmont Heights Civic Club v. Moreland, 637 F.2d

15

430, 436, 442 (5th Cir. 1981). Moreover, in the FSFEIS, defendants responded to plaintiffs' proposed alternatives. See ARII377670–71; ARII377050–57; ARII377459–61; cf. Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc., 435 U.S. 519, 551 (1978); Concerned Citizens All., Inc. v. Slater, 176 F.3d 686, 706 (3d Cir. 1999) ("There is necessarily a limit to the thoroughness with which an agency can analyze every option, and our standard of review is quite deferential." (citations omitted)); Audubon Naturalist Soc'y of the Centr. Atl. States v. U.S. Dep't of Transp., 524 F. Supp. 2d 642, 669 (D. Md. 2007) (noting that the agency need only "briefly discuss its reasons for eliminating alternatives from detailed study").

Plaintiffs also argue that defendants impermissibly relied on "stale data." See Pls.' Mem. [D.E. 40-1] 27, 29; Pls.' Reply [D.E. 45] 20–21; cf. W. Watersheds Project v. Abbey, 719 F.3d 1035, 1052 (9th Cir. 2013) (holding that the defendant did not take a hard look at alternatives when it relied on thirty-year-old data and did not take account of intervening legal changes); N. Plains Res. v. Surface Transp. Bd., 668 F.3d 1067, 1085–86 (9th Cir. 2011) (finding that the defendant's reliance on old survey data, the most recent of which was ten years old, was arbitrary and capricious); Lands Council v. Powell, 395 F.3d 1019, 1031 (9th Cir. 2005) (finding that defendants failed to make an accurate cumulative impact assessment of a project on fish when they relied on six-year-old fish count surveys). In support, plaintiffs contend that defendants' forecasts are unreliable in light of stable traffic volumes on US 74 and the "approximately zero percent growth" in traffic volumes for the past five years. Cf. ARII258173–74 (defendants' explanation of why they believe "the current No-Build traffic forecasts" are "still valid for the purposes they were used."); ARII296518. Moreover, plaintiffs' expert, Dr. Hartgen, contends that the DSFEIS "simply ignores the last 12 years of history regarding traffic trends on U.S. 74." ARII296518.

16

The court agrees that defendants made a troubling assertion concerning the lack of recent growth and its impact on future growth. See ARII258174 ("Based on this trend of no change in AADTs from 2007 to 2012, it is reasonable to conclude that an updated base year No-Build forecast (i.e. 2013) would generally be equal to the 2007 No-Build forecast. Therefore, the 2007 base-year No-Build traffic operations discussion included in Draft EIS Section 1.8.3 would still be valid for 2012 . . . ." (emphasis added)). The DSFEIS and FSFEIS, however, show that defendants repeatedly tested their forecasts with sensitivity analyses using new data and concluded that their forecasts remained valid. See ARII258616–24; ARII258779–87; ARII377370–81; cf. W. Watersheds Project, 719 F.3d at 1052 ("[A]n agency errs when it relies on old data without showing that the data remain accurate." (emphasis added)); Audobon Naturalist Soc'y, 524 F. Supp. 2d 642, 673–74 (D. Md. 2007) (defendants did not violate NEPA by failing to incorporate newer data where they "conducted a limited 'sensitivity analysis'"). Moreover, defendants responded to Dr. Hartgen's criticisms, and it is not this court's role under NEPA to referee expert disputes when the agency reasonably evaluates the relevant factors. See Marsh, 490 U.S. at 378 ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); Hughes River, 165 F.3d at 288 ("Agencies are entitled to rely on the view of their own experts."); ARII377453–96 (listing Dr. Hartgen's comments and NCDOT's responses to each). Simply put, plaintiffs have "failed to show that the traffic computations were unreasonable." N. Buckhead Civic Ass'n, 903 F.2d at 1544 (noting that a district court cannot "designate itself as a 'super professional transportation analyst' to determine the proper traffic planning technique"). Thus, the court rejects plaintiffs' argument.

17

2.

Plaintiffs also argue that defendants relied on a single set of socioeconomic data in constructing their traffic forecasts and thereby failed to accurately consider the impact of the Monroe Bypass. See, e.g., Pls.' Mem. [D.E. 40-1] 31–34; Pls.' Reply [D.E. 45] 9–12. In support, they cite Catawba Riverkeeper Foundation v. North Carolina Department of Transportation, No. 15-CV-29-D, 2015 WL 1179646 (E.D.N.C. Mar. 13, 2015) (unpublished), where this court held that "defendants' fundamental assumption that the Garden Parkway would have no effect on overall growth" in the region and their use of a gravity model to reallocate assumed growth violated NEPA and the APA. Id. at *7.

Defendants' methodology in this case differs in a critical fashion from the flawed analysis in Catawba. In Catawba, defendants also used a top-down, bottom-up approach. The socioeconomic data in that case, however, assumed construction of the Garden Parkway in the top-down approach and merely reallocated the same projected growth in the No Build and Build conditions through the use of a gravity model. See Catawba, 2015 WL 1179646, at *2–3 & n.5; ARII258552 ("Dr. Hammer states that he made specific adjustments to his projections for . . . the Garden Parkway . . . ."). Here, in contrast, the same socioeconomic data did not include the Monroe Bypass; therefore, the top-down analysis represented the No Build scenario. See ARII258552; ARII258608–10. Although the bottom-up analysis originally assumed construction of the Monroe Bypass in calculating the travel-time-to-employment factor, which the Fourth Circuit strongly suggested was clear error, see N.C. Wildlife Fed'n, 677 F.3d at 599–600, 603, defendants changed the analysis in the DSFEIS with a new roadway network that did not include the Monroe Bypass and concluded that the growth-allocation results were the same. See ARII258613–14. This new analysis, and its later use in the

18

updated ICE analysis, properly represented the No Build scenario. See ARII258553.[5]

To create a Build scenario, defendants estimated the growth that the Monroe Bypass project would induce. See ARII258553. To produce an estimate, defendants analyzed improvements in accessibility and travel time, development around potential interchanges, and development potential based on access to sewer and water lines and local jurisdictions' interest. See ARII258631–32. Defendants then added this induced-growth estimate to the growth expected under the No Build scenario to create the Build scenario. See ARII258633. The results of defendants' analysis of the travel-time-to-employment factor showed that, for purposes of the bottom-up approach, the existence of the Monroe Bypass was insignificant. See ARII258551.

Defendants adequately created and compared No Build and Build scenarios, corrected the flaw identified in North Carolina Wildlife Federation, and avoided the flaw in Catawba. In this case, defendants' use of a single set of socioeconomic data to represent the No Build scenario, which they then supplemented with additional data to create a Build scenario, for use in the ICE analysis was not arbitrary and capricious and did not violate NEPA or the APA. See, e.g., N. Buckhead Civic Ass'n, 903 F.2d at 1543–44 (affirming the district court's judgment in favor of defendants where defendants' "choice of methodology was determined to have a rational basis and was consistently applied in an objective manner"); Jones v. Peters, No. 2:06-CV-84BSJ, 2007 WL 2783387, at *23 (D. Utah Sept. 21, 2007) (unpublished) ("[T]his court must decide whether the agencies' choices of method and interpretation as to the modeling of traffic data had a rational footing."). Accordingly,

---

[5] Defendants note that their results concerning the travel-time-to-employment factor are reasonable because Smith was analyzing travel time to local employment centers (defined as "any location with 5,000 jobs within a ½-mile area") and not regional centers. See [D.E. 44] 13 n.5; ARII258611–12. Moreover, defendants commissioned a technical study that explains why growth in Union County continued and will continue in the absence of major transportation projects. See ARII264074–90. These conclusions are rational.

19

the court rejects plaintiffs' first argument concerning the alternatives analysis.

B.

Second, plaintiffs argue that defendants failed to adequately analyze the environmental impacts. See, e.g., Pls.' Mem. [D.E. 40-1] 37; Pls.' Reply [D.E. 45] 28–32; Pls.' Surreply [D.E. 55] 9. In support, plaintiffs contend: (1) defendants failed to account for the growth-inducing impact of the Monroe Bypass; and (2) defendants failed to analyze the cumulative impacts of the project. See Pls.' Mem. [D.E. 40-1] 38–46.

1.

Plaintiffs argue that defendants failed to account for the "growth inducing impact of the Bypass" in three ways. Specifically, they challenge: (1) defendants' assumption that growth in the area would continue if the Monroe Bypass was not built, (2) defendants' estimates of induced growth, and (3) defendants' decision not to adjust the ICE analysis in light of the national recession. See Pls.' Mem. [D.E. 40-1] 38–44.

First, plaintiffs assert that defendants' analysis fails because it assumes that growth would continue even without the Monroe Bypass despite predictions of increased congestion. Thus, plaintiffs argue, the No Build scenario is flawed. See Pls.' Mem. [D.E. 40-1] 39–41.

Plaintiffs' argument misses the mark. As explained, defendants used Dr. Hammer's projections as the basis for the top-down analysis in the No Build scenario because the projections did not include the Monroe Bypass. See ARII258551–52. Thus, defendants estimated the amount of growth that would occur in the region without the Monroe Bypass. In their analysis, defendants studied the very assumption that plaintiffs now attack. See ARII264070–90. Defendants then allocated the projected growth across the TAZs using the bottom-up approach, which, as defendants reasonably analyzed, was effectively insensitive to the presence of the Monroe Bypass. See

20

ARII258550–51. The court cannot conclude that defendants lacked a rational basis in constructing the No Build scenario in this manner. See Vt. Yankee Nuclear Power Corp., 435 U.S. at 534 ("NEPA does not require a 'crystal ball' inquiry." (quotation omitted)).

In opposition to this conclusion, plaintiffs cite North Carolina Wildlife Federation and Friends of Back Bay. In North Carolina Wildlife Federation, the Fourth Circuit stressed the importance of an adequate baseline in the context of defendants' assumption of the proposed project's construction in their No Build analysis. See 677 F.3d at 599–600. Here, however, defendants reasonably analyzed the No Build scenario. In Friends of Back Bay, the Fourth Circuit found the defendants' baseline flawed because it was premised on the historical existence of a no-wake zone where, in reality, the purported no-wake zone was not enforced or even publicly marked. See 681 F.3d at 587–89. Unlike Friends of Back Bay, there is no such nonexistent premise in defendants' No Build scenario. Plaintiffs disagree with the assumptions defendants make, but the assumptions are rational and defendants have taken the necessary hard look. Finally, plaintiffs cite Highway J Citizens Group v. U.S. Department of Transportation, 656 F. Supp. 2d 868 (E.D. Wis. 2009), but that case does not help the plaintiffs. In Highway J, the defendants' discussion in the EIS of environmental impacts simply summarized land use plans and survey responses with a bare conclusion, and the administrative record showed that defendants failed to perform a more thorough analysis. Id. at 886–87. That did not happen in this case. See, e.g., ARII258255–62; ARII258604–14; ARII264070–90.

Next, plaintiffs' argue that defendants' estimate of induced growth conflicts with the predictions of others. In the DSFEIS, defendants estimated that the Monroe Bypass would add one percent to residential growth in the study area. See ARII258644. This one-percent estimate sometimes differed from those estimates offered by local jurisdictions or third parties, but the

21

defendants acknowledged the different estimates in the FSFEIS. See ARII376956–57; ARII377066–70. Moreover, other alleged contradictions that plaintiffs cite do not contradict defendants' estimate. See, e.g., ARII249355 (personal statement by a local mayor that he believes the Monroe Bypass "will promote business development" in the town and county); AR26442 (letter from state resource agency expressing concern about the ability of local land use ordinances to constrain growth in environmentally-sensitive areas); AR26446 (letter from state resource agency expressing concern if growth turns out to be higher than expected); ARII112715 (stating that the Monroe Bypass "will also allow the region to continue to be an attractive location for new businesses and additional residents"); ARII110273 ("The task force has seen this project referenced as important or critical to multiple regions, and therefore it should be one of the highest priorities for DOT."); ARII110759–60 (study noting that the Monroe Bypass "will provide a high-speed toll alternative to the heavily congested current route on US 74" and project savings "can have significant impact on the cost" of a different project); ARII111620–21 (noting that the Monroe Bypass would "further enhance access to" Charlotte and other regions of North Carolina). Simply put, plaintiffs cite no material contradiction in the record that defendants have not adequately addressed.

Finally, plaintiffs cite a comment that NCDOT made in response to a question that FHWA posed about the necessity of adjusting the ICE analysis in light of the national recession. See ARII377061–62. NCDOT responded that "one could argue that it would be more accurate to do so," but that it was unnecessary to do so because it would affect the No Build and Build scenarios similarly and failing to adjust would only potentially overestimate cumulative effects. Id.

Notwithstanding the NCDOT's comment, the FSFEIS shows that defendants conducted a sensitivity analysis with the 2014 data and determined that the previous conclusions remained valid. See ARII377403–17. Defendants' choice to err conservatively in projecting cumulative impacts was

22

not arbitrary and capricious. See, e.g., Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc., 462 U.S. 87, 102–03 (1983) (holding that a reviewing court should not review one figure in a table in isolation when the entire table was structured as a "risk-averse estimate of the environmental impact" that "represented a conservative (i.e., inflated) statement of environmental impacts"); Theodore Roosevelt Conservation P'ship v. Salazar, 616 F.3d 497, 510–11 (D.C. Cir. 2010) (holding that defendants' use of an older, "overly conservative" model of environmental effects was not arbitrary and capricious when analysis of new data would be time-intensive and subject to re-analysis); Save Strawberry Canyon v. U.S. Dep't of Energy, 830 F. Supp. 2d 737, 753–54 (N.D. Cal. 2011) (holding that defendant agencies were justified in using older and more conservative data "which reflected a worst-case scenario").

2.

Plaintiffs assert that defendants failed to analyze the cumulative impact of the Monroe Bypass and other reasonably foreseeable projects. Pls.' Mem. [D.E. 40-1] 44. NEA requires an agency to consider in the EIS cumulative impacts, or "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions." 40 C.F.R. § 1508.7; 40 C.F.R. § 1508.25(c)(3); see Nat'l Audobon Soc'y v. Dep't of Navy, 422 F.3d 174, 196 (4th Cir. 2005); 40 C.F.R. § 1508.25(a)(2) (agencies must also consider cumulative actions, or actions "which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement"). "To constitute a reasonably foreseeable future action, a project must be 'imminent,' 'inevitable,' or one that can be sufficiently concrete that consideration of its effects would be 'useful to a reasonable decision-maker.'" N.C. All. for Transp. Reform, Inc. v. U.S. Dep't of Transp., 713 F. Supp. 2d. 491, 522 (M.D.N.C. 2010) (collecting cases). Moreover,

23

absent a showing of arbitrary action, the court defers to the agency's selection of the relevant study region for the cumulative impacts analysis. See Kleppe v. Sierra Club, 427 U.S. 390, 412–14 (1976); N.C. All. for Transp. Reform, 713 F. Supp. 2d at 521. "The purpose of the cumulative impact analysis is to provide readers with a complete understanding of the environmental effects a proposed action will cause." N.C. All. for Transp. Reform, Inc. v. U.S. Dep't of Transp., 151 F. Supp. 2d 661, 698 (M.D.N.C. 2001).

Plaintiffs argue that defendants failed to consider a number of proposed actions, including superstreet installations along US 74, "parallel road network improvements," and a widening of I-485 and Independence Boulevard in Mecklenburg County to accommodate high-occupancy toll ("HOT") lanes. See, e.g., Pls.' Mem. [D.E. 40-1] 44–46; cf. ARII250522–23; ARII293663; ARII293694–95. As for the superstreet installations on US 74 and parallel road network improvements, defendants adequately analyzed the cumulative impacts in the FSFEIS. See, e.g., ARII70714–16 (2010 quantitative ICE study); AR27231–33 (FEIS); ARII258547–91, 258637–65 (2013 quantitative ICE study update); ARI377236–38. Defendants also adequately analyzed the widening of I-485 and Independence Boulevard within the Final Land Use Study Area ("FLUSA"). See, e.g., AR14292; ARII70716; ARII250522; ARII377236–38; ARII377071–72; ARII377096; ARII377376–77; ARII377415–17.

Plaintiffs also contend that defendants failed to consider the entire length of the proposed widening of I-485 and other toll roads and that this omission violated NEPA because "the projects will create a network of toll highways that would physically connect together and to the Bypass." Pls.' Mem. [D.E. 40-1] 45. This argument, however, ignores that defendants defined the scope of the FLUSA, and therefore the relevant ICE study area, to a smaller area than what plaintiffs contend defendants should have studied. Compare ARII252412 (FLUSA map), with ARII410204. Plaintiffs

24

have not shown that defendants' FLUSA definition was arbitrary. See Kleppe, 427 U.S. at 412; AR21987 (map showing 2008 boundary); ARII70559–61 (describing FLUSA boundaries and modifications); ARII70613–14 (maps showing boundary changes). Moreover, defendants' conclusion that "these projects are not located in areas anticipated to have indirect effects associated with the Monroe Connector/Bypass," based on defendants' earlier definition of and study of the FLUSA, is not irrational. See ARII413451. Simply put, plaintiffs have failed to meet their burden of proving that defendants' cumulative effects analysis was arbitrary or capricious. Cf. Habitat Educ. Ctr., Inc. v. U.S. Forest Serv., 673 F.3d 518, 527–28 (7th Cir. 2012) ("We therefore hold that a federal agency does not act arbitrarily or capriciously by excluding from its final EIS those projects that cannot be meaningfully discussed at the time the agency issues its draft EIS and do not significantly alter the environmental landscape as presented in that draft.").

C.

Third, plaintiffs argue that defendants "[f]ostered a [c]limate of [m]isinformation and [u]ndermined the NEPA [p]rocess." Pls.' Mem. [D.E. 40-1] 46. "The 'informational role' of an EIS is to give the public the assurance that the agency has indeed considered environmental concerns in its decisionmaking process, and, perhaps more significantly, provide a springboard for public comment in the agency decisionmaking process itself." Pub. Citizen, 541 U.S. at 768 (2004) (quotations and alterations omitted); N.C. Wildlife Fed'n, 677 F.3d at 604–05. "[T]he test for NEPA compliance is one of good faith objectivity rather than subjective impartiality." Nat'l Audubon Soc'y, 422 F.3d at 198 (quotation omitted); Fayetteville Area Chamber of Comm. v. Volpe, 515 F.2d 1021, 1026 (4th Cir. 1975). Thus, the court does not inquire into an agency's subjective intent. See Nat'l Audubon Soc'y, 422 F.3d at 198. Rather, the court focuses on "the objective adequacy of the EIS." Id.

25

Plaintiffs argue that defendants actively misled the public. See Pls.' Mem. [D.E. 40-1] 46–47. In support, plaintiffs select a handful of quotes from across the administrative record in an attempt to show contradictory statements by defendants. See id.

The court has reviewed the quotes and the record and rejects plaintiffs' argument. Notably, one of these quotes predates the current DSFEIS and FSFEIS. See ARII110597; ARII289956. Others do not provide contradictory information but merely discuss the Monroe Bypass's potential to relieve congestion. See, e.g., ARII110273; ARII291769–70; ARII385811; ARII385816. Finally, plaintiffs cite defendants' mistaken payments to a contractor that were used for marketing. See, e.g., ARII107077; ARII116996; ARII121586. Defendants, however, discovered the mistaken payments and received reimbursement. ARII352804. The described conduct (individually or cumulatively) does not undermine the FSFEIS and ROD. See, e.g., ARII377019; ARII377082–83; ARII352804.

Plaintiffs also argue that defendants failed to correct the alleged misstatements of third parties, but plaintiffs fail to cite any legal authority for the proposition that defendants have the duty to make such corrections. See Pls.' Mem. [D.E. 40-1] 48; Pls.' Reply [D.E. 45] 33–34. Defendants properly allowed for public comment, and plaintiffs' disagreement with defendants' responses to those comments ignores that defendants responded in detail. See, e.g., ARII376755–377176; see North Carolina v. FAA, 957 F.2d 1125, 1135 (4th Cir. 1992) (noting that agencies in a rule-making context are required only to "reasonably respond to those comments that raise significant problems."); Sierra Club v. Adams, 578 F.2d 389, 394 (D.C. Cir. 1978) ("Each comment that merited further consideration was carefully indexed, and over fifty individual responses were made by the Government, most on a paragraph-by-paragraph basis."). Finally, the court rejects plaintiffs' argument that defendants' editing of the DSFEIS and FSFEIS violated NEPA by preventing public participation in the decisionmaking process. See Webster, 685 F.3d at 425.

26

In light of the administrative record as a whole, defendants complied with NEPA's requirements to "provide a springboard for public comment in the agency decisionmaking process itself." Pub. Citizen, 541 U.S. at 768 (quotation omitted). Thus, the court rejects plaintiffs' argument.

D.

Finally, plaintiffs argue that defendants violated NEPA when they released the FSFEIS and ROD simultaneously. In 2012, Congress passed the "Moving Ahead for Progress in the 21st Century Act," or "MAP-21," which included a measure for "accelerated decisionmaking in environmental reviews." MAP-21 Act of 2012, Pub. L. 112-141, § 1319, 126 Stat. 405, 551 (2012) (codified at 42 U.S.C. § 4332a). Section 4332a states that, "[t]o the maximum extent practicable, the lead agency shall expeditiously develop a single document that consists of a final environmental impact statement and a record of decision." 42 U.S.C. § 4332a(b). The statute provides two exceptions where a single document containing the FEIS and ROD is not authorized: (1) "the final environmental impact statement makes substantial changes to the proposed action that are relevant to environmental or safety concerns," or (2) "there are significant new circumstances or information relevant to environmental concerns and that bear on the proposed action or the impacts of the proposed action." Id. Plaintiffs argue that under the second exception, defendants had to separate the publication of the FSFEIS and the ROD because the new 2014 socioeconomic data constituted "significant new circumstances." Pls.' Mem. [D.E. 40-1] 51–52. Plaintiffs also argue that defendants' decision to issue a joint FSFEIS and ROD precluded public comment on and scrutiny of the updated socioeconomic data and projections and, consequently, the need for the project. Id.

The parties dispute the standard under section 4332a(b)(2). Defendants argue that the standard required for a supplemental EIS applies. See State Defs.' Mem. [D.E. 44] 42. Plaintiffs

27

oppose this standard, but do not offer one of their own. See Pls.' Reply [D.E. 45] 35.[6]

The Fourth Circuit has not analyzed section 4332a(b). In fact, the court has not found any reported case construing section 4332a(b). Notably, however, the language of section 4332a(b)(2) tracks, with no material differences, the language of NEPA regulations governing the issuance of a supplemental EIS. Compare 42 U.S.C. § 4332a(b)(2) (not permitting a single FEIS and ROD if "there are significant new circumstances or information relevant to environmental concerns and that bear on the proposed action or the impacts of the proposed action"), with 40 C.F.R. § 1502.9(c)(1)(ii) (requiring a supplemental EIS if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts"). Thus, the court interprets section 4332a(b)(2) to require that, for section 4332a(b)(2) to prohibit release of a single document containing the FEIS and ROD, the "significant new circumstances" must rise to the level of requiring a supplemental EIS. See Air Wis. Airlines Corp. v. Hoeper, 134 S. Ct. 852, 861–62 (2014) ("[I]t is a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it is taken." (quotation omitted)).

"[T]he determination that an EIS not be supplemented is controlled by the arbitrary and capricious standard." Hickory Neighborhood Def. League v. Skinner, 893 F.2d 58, 63 (4th Cir. 1990) (quotation omitted). New circumstances require a supplemental EIS when they "present a seriously different picture of the environmental impact of the proposed project from what was

_____

[6] Plaintiffs suggest that the proper remedy is to "separat[e] out a FEIS and ROD into two distinct documents with a 30-day period of scrutiny in between." Pls.' Reply [D.E. 45] 35. Plaintiffs appear to hedge, however, on what that period would entail, suggesting at one point that public comment would be appropriate, see Pls.' Mem. [D.E. 40-1] 53, only to later state that this would be a period of "public and decision-maker scrutiny." Pls.' Reply [D.E. 45] 36. The relevant regulations, however, require a comment period only for the draft EIS. See 40 C.F.R. § 1506.10(c).

previously envisioned." Hughes River Watershed Conservancy v. Glickman, 81 F.3d 437, 443 (4th Cir. 1996) (quotation omitted)); Hickory Neighborhood Def. League, 893 F.2d at 63; Cape Hatteras Access Pres. All. v. Jewell, 28 F. Supp. 3d 537, 549–50 (E.D.N.C. 2014).

Here, defendants analyzed the new 2014 data and published their conclusions in the FSFEIS. See ARII377365–99. Defendants compared the 2030 and 2040 No Build scenarios with the 2014 data to the 2030 No Build scenario with prior data, noted that both of the 2014 data models "show[ed] substantial growth when compared with the existing . . . traffic volumes along US 74," and concluded that "an updated No-Build traffic forecast would not change the conclusions in the Draft EIS." ARII377371–72. Defendants also compared the 2030 and 2040 No Build scenarios with the 2014 data and concluded that growth would continue to occur between 2030 and 2040. See ARII377372. Defendants similarly analyzed the Build scenario with the 2014 data and the effect of the Monroe Bypass on the US 74 corridor. See ARII377376–79. Defendants ultimately concluded that the 2014 data would not change their conclusions regarding traffic forecasts for the project. See ARII377365. Defendants thus concluded that the new data did not present a "seriously different picture" of the Monroe Bypass project's environmental impacts, and therefore did not constitute significant new information requiring a separate FSFEIS and ROD. See State Defs.' Mem. [D.E. 44] 42.

Defendants' decision that the 2014 data did not constitute "significant new circumstances or information" was not arbitrary and capricious. Defendants analyzed the new information and compared it to their previous traffic forecasts for the Build and No Build scenarios, concluding that the updated data did not change their conclusions. The record shows that defendants had a rational basis for their conclusion and did not clearly err in their decision to issue a combined FSFEIS and ROD. See Hughes River, 165 F.3d at 287–88; Hickory Neighborhood Def. League, 893 F.2d at 63;

29

Wisconsin v. Weinberger, 745 F.2d 412, 416–17 (7th Cir. 1984); Audobon Naturalist Soc'y, 524 F. Supp. 2d at 661, 673–74; Citizens Concerned About Jet Noise, Inc. v. Dalton, 48 F. Supp. 2d 582, 595 (E.D. Va. 1999) ("NEPA does not impose a requirement that the environmental impact analysis be perfect, only that the decisionmaker has sufficient information to accurately compare the environmental effects of the various alternatives.").

Finally, the court rejects plaintiffs' argument that defendants were required to issue a separate FSFEIS and ROD "in [l]ight of the [s]ubstantial and [w]idespread [c]ontroversy [s]urrounding the [b]ypass." Pls.' Reply [D.E. 45] 36–37. Plaintiffs cite no provision in section 4332a that prohibits the use of a combined FSFEIS and ROD in the case of "controversy." See Pls.' Mem. [D.E. 40-1] 51. Rather, plaintiffs cite FHWA "interim joint guidance on implementing" section 4332a. See ARII295507; Pls.' Reply [D.E. 45] 36. That guidance states that, if there is "a substantial degree of controversy," the FHWA "may decide not to combine an FEIS and ROD . . . if the agencies believe that issuing the FEIS as a separate document could help to resolve the controversy." ARII295510 (emphasis added). This statement, however, is listed as one of five factors guiding the agencies' discretion in choosing to issue a combined FEIS and ROD. See ARII295509–10.[7] Furthermore, in this case, before issuing the combined FSFEIS and ROD, plaintiffs submitted lengthy comments to defendants about the project's potential impacts, and defendants responded to those comments. See, e.g., ARII258390–258412; ARII376970–377105. On this record, defendants did not act

___

[7] The FHWA's "final guidance" on MAP-21 states that an agency "must issue a combined FEIS/ROD unless the conditions described in the statutory exceptions exist . . . or the Administrator . . . determines that combining the documents is not practicable." Federal Highway Administration, Final Guidance on MAP-21 Section 1319 Accelerated Decisionmaking in Environmental Reviews, http://www.dot.gov/sites/dot.gov/files/docs/MAP-21_1319_Final_Guidance.pdf (last visited Sept. 10, 2015).

arbitrarily and capriciously when they concluded that separating the FSFEIS and ROD would not help to resolve the alleged controversy. Thus, the court rejects plaintiffs' final argument.

E.

Defendants have taken the necessary "hard look" at the Monroe Bypass. In reaching this conclusion, the court recognizes the sincere opposition of plaintiffs, some citizens, and some local jurisdictions to the Monroe Bypass. The court also recognizes that others support the Monroe Bypass. NEPA, however, does not address the wisdom or lack of wisdom of a project. "NEPA merely prohibits uninformed—rather than unwise—agency action." Robertson, 490 U.S. at 351. Defendants complied with NEPA and the APA. Nevertheless, nothing in this decision prohibits plaintiffs and other opponents of the Monroe Bypass to continue to seek relief from the political branches.

IV.

In sum, the court GRANTS defendants' motions for summary judgment [D.E. 41, 43], DENIES plaintiffs' motion for summary judgment [D.E. 40], and DENIES plaintiffs' motion for a temporary restraining order and preliminary injunction [D.E. 56] and motion for a hearing [D.E. 73]. The clerk shall close the case.

SO ORDERED. This ₁₀ day of September 2015.

JAMES C. DEVER III
Chief United States District Judge

31